and Mr. Bryant. You may proceed. I'd like to reserve three minutes for rebuttal, if I may. May it please the court? My name is Raymond Bryant, and I, along with my co-counsel, Zach Schiffler, represent the plaintiff and appellant in this case, Adrian Martinez. Your Honors, we're asking this court to overturn the erroneous decision of the lower district court, which granted qualified immunity to the use of severe police canine force that was obviously unnecessary and unjustified under the circumstances. The officers used a police canine to attack Mr. Martinez while he lay unconscious and injured on the ground, lying in a fetal position, wearing nothing but his underwear. He was confined in a small outdoor closet, where he was surrounded by at least six officers for at least ten minutes before the deployment occurred. During that ten-minute period, the officers stood around, discussed a plan to deploy the canine on the defenseless man without any threat pending before them. During that period, they never told him he was under arrest, never established a line of sight or communication, and never considered non-forceful alternatives like the police ballistic shield they had in the trunk of the car, which was just yards away. Counsel, can I just stop you there and ask, he was in a closet. Wasn't the problem that they had to extricate him from the closet safely? I mean, with regard to their safety? I mean, there was no pending threat, Your Honor. They knew with 100 percent certainty through a dog sniff that he was behind the closet. They also knew that he was injured. He had woken up from the hospital that day after an attack by bounty hunters the prior evening. So they knew he had a severe head injury. They knew he was acting weird, but had no information that he was acting threatening in any manner. Right, but should they just leave him there, I guess? I mean, are you disputing the need to extricate him from the closet? It depends on what you mean by extricate, Your Honor. Take him out safely with regard to their safety. Sure. I think all they had to do was open the closet door, which they did before releasing the canine to attack him. So if they had just performed half of their plan, opened the door, and then arrested him, there would have been no problem. Did they know that he was not armed? They had no reason to believe he was armed, Your Honor. Well, did they know that he was not armed? The officers have testified that they didn't know one way or the other, and in defendant's briefs they said at least six times that they did not know whether he had any weapon or whether he was armed or whether he might be dangerous. I think that's one of the key issues in this case, Your Honor. Without any evidence or information indicating that this man was armed or dangerous, they had nothing to justify the force they deployed on him. The second grand factor... Well, could they see him? Behind the closed door? Well, could they see his hands or any weapon there? I mean, I guess I'm just trying to get at how they said they didn't know, and I guess you're saying they didn't know. So how were they going to figure out whether he was armed or not? Well, Your Honor, without any information indicating this man is armed or dangerous or has any intent or any means by which to threaten the officers, they don't have information sufficient to support the second grand factor. Second grand factor, of course, looks at whether there's an imminent threat facing the officers at the moment the force is deployed. And, of course, without any information, there's nothing supporting the justification under that factor. So I guess what I'm saying is without information, they do not have anything to justify force. There are many cases that this Court has reviewed, including cases we've cited in our brief, for example, in Kavanaugh, where the officers say the same line, we didn't know. But, Your Honor, there are always occasions where police in contact with suspects don't know whether somebody has a weapon. There are many occasions where police don't have a full view of somebody. The classic example is a traffic stop. Are we to say that if we follow the defendant's line of reasoning that any time a police officer pulls someone over, runs their plate, and realizes there's somebody with a warrant, and they can't see the person's hands, they can deploy a police dog? Absolutely not. A police dog is a severe level of force, Your Honor. Way above tasers, batons, and other types of force this Court has reviewed regularly. Well, we're looking at the facts from the perspective of an objective officer from what we've encountered here. And, I mean, on the gram factors, as I understand your argument, your client wins or should be favored on all four of the gram factors? Yes, Your Honor. We believe that we prevail on all three gram factors. And although the District Court did not actually do a complete analysis, gram analysis, the Court did assume while citing the gram factors that we prevailed on those factors. That's why it assumed that there was a constitutional violation. It did not go through which constitutional violations, and that's why I go through in the brief and I explain the four different theories of constitutional liability. First and foremost is the canine handler, Officer Jenny Ann. That officer did have full knowledge of what Mr. Martinez looked like in his defenseless position after he opened the door. The testimony by Officer Jenny Ann was that when he opened the door, he saw him lying sideways on the ground, not moving. And we asked him, why didn't you pull back on the leash? And he said, because I didn't see his hands. But not seeing someone's hands is not justification to use such a severe amount of force on somebody. They might have questions. They might take a step back. They might take a defensive position. But you cannot use prophylactic force just because something bad might happen, particularly when you're faced with a situation like this, where the man, even if you give the officer the benefit of the doubt, can't see his hands. The man's not moving. He's not in an aggressive position. He's not in a threatening position, which was conceded by Officer Jenny Ann. And so then you have the second, of course, area where you might, I guess, second point in time where you might evaluate the justification for force, when Sergeant Boris and Officer Jenny Ann, before the deployment of the dog, discussed this deployment plan in advance. Officer, I'm sorry, Sergeant Boris actually testified under oath that he didn't authorize the force automatically. He told Jenny Ann, if there's a threat when the door is opened, then you can deploy the dog. Officer Jenny Ann testified that there was an automatic deployment plan. Honestly, Your Honors, it doesn't really matter. That's a disputed fact for the jury. What matters here is the officer deployed force, and there's no conduct which would indicate an objective, imminent threat, or objective movement to run, to flee, to resist arrest, in any way, shape, or form. There are multiple cases, including Morris v. Noe and Vet v. K-9 Officer Sanders, which make clear that if those second two gram factors flow in favor of the plaintiff, even if the first gram factor does not, serious crime, then plaintiff should prevail. There should be no qualified immunity. On the qualified immunity note, I'm sorry, did you have a question, Judge Netson? Well, I think you were just about to get there anyway, but I'm interested in your argument on the second prompt of qualified immunity, and let me just throw a couple things out and you can proceed. Is your argument on the second part of qualified immunity based on Supreme Court and Tenth Circuit cases that are factually analogous, or are you relying more on some notion of obviousness, obvious clarity? And I'll stop there and let you go on with the argument. Thank you for that question, Your Honor. I think that brings me to, I guess, the heart of the dispute in this case on qualified immunity. We are arguing both obviousness as well as application of this court's Tenth Circuit precedent, including key principles such as the legitimate justification rule. And then we are also arguing that if this court requires more granular specificity than those cases provide, then it should look to the prevailing weight of authority, in which we said at least four out-of-circuit cases that are specific K-9 cases, and where those courts discuss in their analysis that the reason there's excessive force is because there's evidence of non-threatening persons that are not resisting or fleeing. Those second two prongs in all of those case analysis are the common thread that links all of them to this case. But there are more than just those K-9 specific contexts. I would look, Your Honor, and I would point this court to not only Vette versus K-9 Sanders, but also Kavanaugh. That was decided after the incident, correct? That's correct, Your Honor. But the Vette incident did occur in 2017, a year before our incident. And when that case was analyzed for whether the law was clearly established as of 2017, the court declared that it was. So if this court relied on the same cases that Vette decided, then it would come to the same conclusion. And so in figuring out which cases to look to, I would point this court to Moore's v. Noe, 2012 Tenth Circuit case, as well as Kavanaugh v. Woods, 2010 Tenth Circuit case. Both of those cases, neither of them involve a K-9 force, but they both involve intermediate levels of force. And they both involve analyses where this court actually says, without evidence of an imminent threat, without activity of someone fleeing or resisting, then you have an obvious constitutional violation. And so that brings me around, Your Honor, to the question you asked, whether we're arguing for obviousness. Absolutely we are. Any reasonable officer faced with these precedents and the legitimate justification rule would know that it's unconstitutional to release a K-9 to attack a person when there is no conduct indicative of a threat fleeing or resisting. Counsel, can I just pick up on your reference to Vette? And help me, I think your opposing counsel will make this argument, so I'm just In that case, hadn't the defendant already been apprehended? In Vette? Yeah. And isn't that a distinction here? Because your client was not, right? That's right, Your Honor. And so can you help me understand why that would be a case we could look at to say that the right was clearly established? Yes, Your Honor. Vette came on the heels of Morris v. Noe, Kavanaugh, Casey v. Federal Heights, and other precedents that utilized the legitimate justification rule. That legitimate justification rule is very clear and has been echoed in numerous cases. And it says, it would be excessive to use force, generally force, not specific to K-9 or otherwise. It's excessive to use force when there is no threat, such as when somebody has been subdued or is otherwise no threat. So I think the key principle here is that the principle is broader than just after somebody is subdued. The district court read it to just say, after somebody is subdued. And so it read Vette way too narrowly to only mean force is excessive after somebody is subdued. Force is excessive also when somebody doesn't present a threat. And I can't think of any other example of somebody not presenting a threat more clearly than when somebody is lying in a fetal position, the most offensive and innocent position somebody can be in, and not moving at all. The movement doesn't come during the 10 minutes that the officers are standing around outside the closet. There's no movement after the door is opened. So whether you look at this case from the perspective of Jenny Ann, who saw it, or Voris, who planned it, either way, there was no information indicating those things that are critical to the Graham analysis. Based on this record, is it unreasonable or would it have been unreasonable for the officers to believe that he might have had a weapon and that he might be resisting extrication or resisting arrest? Completely unreasonable, Your Honor, without any information suggesting that he would have had a weapon, that he was intent on harming the officers, or was in a position to harm any of the officers. Without any information. And that's one of the errors that the district court committed. It actually granted great deference, great leniency, and great ambiguity to the officers by saying, what if? We don't know. So the officers get to use force? Your Honor, we cannot go down that road, but we're going to get officers using force in much greater numbers. And I have to tell you, there are a number of K-9 courses percolating up to the courts right now. And so I ask this court to be very clear about this case so those cases don't have to come before this court and raise additional judicial resources. This is the paramount example. If someone's in a fetal position, don't attack them. Give them a chance. Well, didn't they say, come out, come out, come out? That fact is highly disputed, Your Honor. Okay. Yeah, help me understand that. Sure. The officers claim that they gave continuous commands to come out or else the dog's coming in. First of all, we actually have four minutes of body camera footage leading up to the deployment, and there isn't a single thing said. The officers stand there silently for four minutes, and then they open the door. They don't say anything after opening the door. They just release the K-9 in to attack this man in a confined environment where an attack is going to be quite, I dare say, lethal. It wasn't lethal, but it was quite serious. This man is disabled. He was a mechanic and will and not looking at the second force that we described. The first one is releasing the K-9 to attack in the first place. The second is after the K-9 attacks and is latched onto my client's arm, the K-9 officer yells, get him, get him, which, according to testimony, he knows is going to excite the dog. And so as a result, the dog doesn't just bite and hold. He's doing this. He's kind of thrashing around. And we get this gash-type injury on his arm, which is different than the injuries this dog has ever, I guess, it's different than any other injury it's put on a person before, other than if it's bitten multiple times. Your allegation isn't, it's not that there was a second bite. It's that the continuation of the initial bite hold. Yes, Your Honor. It was a continuation, but it was a different kind of injury at the point where the dog's getting excited. That's why it creates this, I guess, open gash wound, which is what actually caused the disability. If it were just a puncture wound, it would have been much less likely to cause the kind of significant injury that it did. But if you'll see the pictures, his arm is ripped open. You can see what was described as hamburger meat, but it's pretty ugly. Muscle tissue damage, as well as nerve injury, which is what put his career to bed. So at this time, I see that I'm close out of time. All right. Thank you, Counsel. We appreciate that. Good afternoon, Your Honors. May it please the Court, I'm Jonathan Eddy, and I represent the defendant officers in this case. Plaintiff's failure to overcome defendant's qualified immunity by providing clearly established law demonstrating a violation of the Fourth Amendment in sufficiently similar circumstances is dispositive of this entire case. The most recent Supreme Court decision in this specific area, Atalaqua v. Bond, recently reaffirmed the need for heightened similarity in use-of-force cases specifically. While cases with identical facts are not necessary, the Supreme Court and this Court have made clear, especially of late, that what is needed is a heightened degree of specificity to the operative facts of the case. Mr. Lutz. Why doesn't the obvious clarity rationale apply here? You take cases that have been marshaled that maybe aren't exactly on point, but stand for certain principles, and then if those apply with obvious clarity, that can be a way to satisfy the second prong. Why doesn't that work here? Because of the totality of these circumstances, Your Honor. These circumstances make this case unique, and what are, in terms just, in what, in short, justify the use-of-force in this case, or at the very least, made it not clearly established that the Fourth Amendment was violated here. What plaintiff has attempted to do repeatedly in the That's not proper. The Supreme Court and this Court has made repeatedly, made clear repeatedly, time and time again, that you have to look at the totality of the circumstances. The totalities of the circumstances of this case are just this, and these are not genuinely disputed. That Mr. Ginnian had multiple felony warrants, and that officers were aware of these warrants. That Mr. Martinez had been involved in an altercation with Bondsman the night before. That Mr. Martinez was code zero, indicating a propensity for violence or to otherwise resist arrest. Mr. Martinez had entered various unoccupied vehicles during his flight and attempted to enter a woman's vehicle as she was departing the apartment complex while he was in the process of fleeing from officers. The plaintiff proceeded to the third floor of the apartment complex and the storage closet had not been searched. The officers had no way to know what was inside that storage closet and therefore had no way to know whether Mr. Martinez had armed himself, whether inside the storage closet or beforehand. Mr. Martinez had been fleeing officers for almost 90 minutes before Kenzie the police dog located him in the closet. The closet in question was of doing plaintiff if he ultimately decided to fight. Does this record disclose whether he knew the officers were following him? And conversely, did the officers identify, did they see him before they located him in the closet? They did, your honor. Officer Smith, at the time, now McDonald, the female officer in this case, she observed plaintiff running towards her patrol vehicle. Her testimony is she made eye contact with him. At that moment in time, he immediately changed direction and started running in the opposite direction. With respect to Mr. Martinez's subjective understanding of whether he was being pursued, that's not relevant here, your honor. I think as you alluded to earlier, it's the objective perspective of a reasonable officer on scene, not the suspect's subjective interpretation of what's happening. The other complicating factor with Mr. Martinez's subjective understanding is that he's testified to having virtually no memory of this event. Per Mr. Martinez, his recollection is waking up in the hospital, leaving the hospital, and then all of a sudden being in a storage closet, pulling out his IVs, and then passing out. And the next thing he knows is that a dog is biting him. Additional key facts in this case are that at the moment Kenzie was deployed to attack, officers could not see Mr. Martinez's hands, and he remained with his back to them in the storage closet. That Officer Jenian commanded Kenzie to release the hold immediately upon seeing that, upon seeing plaintiff's hands and noticing that they were, that he was in fact unarmed, and that Kenzie's bite hold lasted no longer than 15 to 20 seconds. Based on the operative standard, the operative prong to qualified immunity standard, plaintiff at a minimum was required to provide a binding case where a K-9 was used against a barricaded felony suspect who had fled officers, who was reported to be dangerous, whose hands remained concealed at the moment force was used, and where the force was immediately disengaged once it was confirmed that the suspect was unarmed and had been subdued. Plaintiff has not provided a case anywhere near analogous enough to overcome defendants' qualified immunity here. Turning to that, in addition to the fact that that case was decided in 2020 or 2021, after the 2018 event, it's irrelevant. It's also highly distinguishable. There, as Your Honor pointed out, that police dog was deployed three to five minutes after the suspect had been subdued by two prior officers, and there was no reason, there was no reason for that K-9 officer to believe that the suspect may have been armed because he'd already been subdued by the other two officers. Well, can I just stop you there? Yes. Because I think your posting counsel says, argues that at least at the point of them standing there, there was no reason to believe that the defendant was dangerous here. It's just an absence of information, and in an absence of information, you don't satisfy that gram factor. Can you address that? Well, it's not a complete absence of information. There's a, it's, there's an absence of confirmation that he is in fact armed, but based on these circumstances, officers feared that he may very well could have been armed, based on the fact that he'd eluded for such an extended period of time and the fact that he was to come out. From that, officers made the reasonable, objective determination that Mr. Martinez had made the conscious choice to not peacefully surrender. The other part of that is this. Plaintiff was, he was classified as code zero, and within the department that means that the suspect is, is basically dangerous. It means use caution, and the basis for that would be he's been known to use violence or that he was, he's been known to resist arrest. So it's, it's, it's not, it's not in dispute that, that the officers had reason to believe that he may have been dangerous. Well, did they have a duty to, you know, discuss, consider other types of force in these particular circumstances that might be less harmful to the, to the suspect? You know, say a taser. Mr. Bryant suggests police shields. You know, I don't know. Is, is a dog more of an escalation than they, than a reasonable person would expect in these circumstances? Certainly, it can be discussed, and in fact, it was discussed in this case. There was a plan made to force entry into the door, given the fact that Mr. Martinez was not responding to commands to exit, nor was he responding to specific warnings that if he did not exit, a police dog would be sent in to bite him. In terms of alternative uses of force, there are various reasons why those alternative uses could not be employed here. Just to put it in perspective, there were numerous additional officers on scene. One was tasked with employing lethal force, if necessary. Defendant McDonald specifically was tasked with having her taser at the ready, if it was needed. And there was a, another officer that had a beanbag shotgun. And when these officers were testified as to why, you know, none of those other additional uses of force could have been more, more appropriate here, the answer was simple. Plaintiff's positioning, his body positioning, exposed his spine in the back of his head to the officers. And from the, from the distance that Officer McDonald and her taser were located, it would have posed a... Well, just for clarification, was the decision made to deploy the dog before the door was opened or after the door was opened? The initial plan was to utilize Kenzie once the door was deployed. There's a, there's a dispute among the officers as to whether it was to be an automatic deployment, otherwise known as a dynamic entry or not. Sergeant Voris says that, that Jennian should have assessed the situation before deploying. Jennian, based on the totality of the circumstances known to him prior to the door being open, made the determination that this would be a dynamic entry based on the totality of facts. Based on his training, this wasn't... So I'm, what I'm hearing is the inference at the summary judgment stage then, to the extent that we draw inferences in favor of the plaintiff, would be that a decision had been made to deploy the dog without any assessment because that decision was made before the door was open. According to, that was the plan according to Jennian. Jennian's mind, he had made his mind up that this was to be a dynamic entry. And this is a, essentially a textbook example of when you utilize a police dog. You have a fleeing felon suspected of being, or known to be dangerous for the... Well, is it? I, I, I'm, I'm now, I'm, I'm curious. The, the district court assumed without deciding that there was a constitutional violation. Was there one? I mean, you've, you, you've spoken at length about prong two, but on the gram factors, once the door was open, did the suspect pose an immediate threat? And was the suspect actively resisting when the door was open? In hindsight, your honor, no, knowing what we know... In hindsight, what the police officers saw, what a reasonable, objective police officer would see when the door was open, was there a threat? Was there resistance? What the officer knew as the door was being opened was that he could not see Mr. Martinez's hands. Mr. Martinez was a fleeing felony suspect who was suspected of being violent. He could not see his hands. He made the determination to, to execute a dynamic deployment. He was lying on his stomach, half, or maybe not even half-clothed, and he wasn't moving. Right. And yet, there goes the dog. Gram violation? No, your honor. And I will say with respect to what the district court assumed, the district court in a few paragraphs above that said that it was hard-pressed to find a constitutional violation in these circumstances. To find a constitutional violation. Hard-pressed to find a constitutional violation. Yes, your honor. I would like to draw the court's attention quickly to the case of Gutierrez versus Hackett. While I acknowledge this is an unpublished decision, and it's, it was a, it was an appeal of a jury verdict, I think it's appropriate given that it's, of my extensive research into all the cases involving police canines in the Tenth Circuit, this is without a doubt the closest one in terms of factual similarity. Here we had officers were called to respond to a suspected vehicle theft. They got on scene. The suspect was concealed in the vehicle, curled up in the passenger seat of the vehicle. The officers knocked on the window, said, come out, come out, come out. If you do not, we will deploy a police canine. Suspect didn't respond. He kept his hands tucked underneath his body. Officers gave another round of commands. No response. Officers sent in the dog, pulled the man out, immediately disengaged the dog, and that was it. This case went to a jury. Jury found in favor of the officers in that case. That was appealed, and essentially the Tenth Circuit looked at that and said there was, you know, no, there was no reason to believe that there would have been an underlying violation of the Fourth Amendment here. In other words, there was not substantial evidence to The reason I mentioned the case, Your Honor, is because I think at the very least, it disqualifies this case from the clearly egregious standard where you have officers, or where you have the Tenth Circuit assumed the facts that are virtually identical to the facts in this case. Concealed, felony suspect, no reason to believe he was armed. He just had his hands tucked underneath his body. Dog went in. The judges found that there was no clear violation of the Fourth Amendment, so to overrule the jury. Mr. Bryant indicated that there are cases out of circuit that seem to be going in his direction. What's your take on that? Well, that's been significantly briefed, Your Honor. We've distinguished virtually every case that he's put forward. You know, I think today he referenced Kavanaugh versus Woods. I think that case is highly distinguishable. That case, not only did it not involve a police canine, it did involve a fleeing suspect, let alone a fleeing felony suspect. And there, I think it was undisputed that officers could see that the woman in that case was unarmed when they fired a taser into her back. So that case, obviously, is highly distinguishable. There's a Ninth Circuit case, the Chew case. Again, highly distinguishable. He was not suspected of being armed. The dog in that case virtually severed the man's limb. And the main issue the Ninth Circuit had with that deployment was the duration of the bite and the fact that the bite was not called off sooner after they were shot. All right, counsel, I think your time has expired and you're excused. Counsel are both excused and will submit the case. Thank you, Your Honor.